STEPHEN U. CADWELL, Respondent, v. MARKS ARNHEIM, Appellant.

*Damages for injuries — proof of freedom from contributory negligence — runaway team — duty of the driver to keep to the right.*

In an action brought to recover damages for injuries received from a runaway team of horses, the burden is upon the plaintiff to show his freedom from contributory negligence, but the fact that he continues on the right-hand side of the road, while the runaway team is approaching him on that side, does not establish contributory negligence on his part.

It is the duty of a driver of a runaway team of horses, when he finds that he cannot stop them, to guide them if possible to the right side of the road, in order to pass a vehicle going in the opposite direction, without a collision.

The driver of a vehicle on a road has a right to expect that the driver of a runaway team, traveling in the opposite direction, will make an effort to guide his horses to the right.

Where horses are running away and are beyond the control of the driver, and the driver uses due diligence and the best of his ability as a skillful driver to control the horses, and cannot control them, the law of the road as to which side the horses run on after they take fright does not apply.

PARKER, J., dissenting.

APPEAL by the defendant, Marks Arnheim, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 8th day of March, 1893, upon the verdict of a jury for $2,500, rendered after a trial at the New York Circuit, and also from an order entered in said clerk's office on the 5th day of March, 1893, denying the defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*C. Fine*, for the appellant.

*A. R. Dyett*, for the respondent.

BARRETT, J.:

The defendant was not held responsible for the runaway, but for the negligence of his driver in not at the time properly guiding the horses.

The evidence was conflicting upon the point whether horses while running away can be guided to the right or the left. There was enough to go to the jury upon this question, and they found that the defendant's driver could have averted the collision by guiding his horses to the right.

This is this case in a nutshell. The plaintiff was driving quietly and properly upon the right of the road going south. The defendant's horses were running away upon the left of the road going north. The plaintiff could not get any further to the right because of the presence of trees. He in fact was at the extreme right of the road. He could not safely turn to the left. That would have increased his danger. Indeed, it would probably have been fatal in view of the proximity of the defendant's horses and the speed with which they were approaching. The defendant's horses were upon the wrong side of the road, dashing forward directly in front of the plaintiff, who was, as we have seen, upon the proper side. It was plainly the duty of the defendant's driver, when he found that he could not stop his horses, to guide them, if possible, to the right,

and thus to pass the plaintiff without a collision. As the evidence was sufficient to justify the jury in finding that the defendant's horses could have been thus guided, and that the driver failed to make a proper effort in that direction, the verdict should not be disturbed.

The evidence failed to substantiate the defendant's contention that the plaintiff was himself guilty of negligence. On the contrary, the burden of showing freedom from contributory negligence was fairly met by the plaintiff. In fact, there was nothing which, under the circumstances, the plaintiff could possibly do which he did not do. Had he done what the defendant insists he should have done, he would have been far more amenable to criticism. It would have been shockingly bad judgment to risk a turn to the left at such a critical moment, and the result would probably have been far more disastrous than it was. The plaintiff had a right to expect that the defendant's driver would make an effort to guide his horses to the right. He cannot well be blamed, therefore, for not guiding his own horses in such a way as — had the driver fulfilled his just expectation — would certainly have precipitated a violent and, doubtless, fatal collision.

The exceptions taken by the defendant to the reception and rejection of evidence were, in the main, unimportant. But none of them raises any question of substantial prejudice.

As to the charge, we think the case was fairly and correctly submitted to the jury. The defendant insists that it was error to charge certain of the plaintiff's propositions to the effect, in substance, that if the defendant's driver was guilty of negligence "*the plaintiff was entitled to recover.*" It is contended that the question of contributory negligence was thus withdrawn from the jury. But it is evident from the entire charge that this was not intended. Nor could the jury have so understood it. The learned judge repeatedly instructed the jury that, if the plaintiff was guilty of contributory negligence, he could not recover. In one part of his charge we find the following statement of the law : "It is necessary, in order that he recover, that he should satisfy the jury that this collision was caused by negligence on the part of the defendant's coachman, and that he himself was free from fault, and that his own negligence

FIRST DEPARTMENT, OCTOBER TERM, 1894.          [Vol. 81.

did not contribute to the accident; and the burden of proof is upon him to satisfy you upon these points." In another part of his charge he says: " As I have already stated, it is undoubtedly true, as a matter of law, that a plaintiff who is in fault himself, and who has not exercised ordinary care, cannot recover in a case of this description; and I shall, in this case, leave it to the jury to say whether there was any want of ordinary care on the part of the plaintiff." And again, in summing up upon the whole case : " The jury have heard all the testimony and have heard the comments of counsel, and understand the situation, and I will leave it to them to say whether they think the plaintiff failed in exercising ordinary care under the circumstances. If he did not, he cannot recover; but if he did use the ordinary care that is to be expected of a driver under these circumstances, and the coachman was guilty of negligence that brought on the collision, then the plaintiff is entitled to recover."

It is clear, therefore, that the expression complained of in the plaintiff's propositions related solely to the legal bearing, upon the defendant's general responsibility, of the negligence of his driver. What was intended was to convey the idea that if the driver could, with proper effort and diligence, have turned his team to the right and thus avoided the collision, the defendant's negligence was made out. It must have been entirely clear to the jury that the proposition was in harmony with the learned judge's colloquial charge, and they must, therefore, have understood that the proviso of that charge with regard to contributory negligence was, as a matter of course, the starting point of these propositions.

The defendant also complains of the following proposition, which, at the plaintiff's request, the learned judge charged : " It is conceded that at the time of the collision between the plaintiff's team and the defendant's team, the plaintiff's team was being driven on the right of the center of the road, in a southerly direction, and the defendant's team was being driven to the left of the center of the road in a northerly direction."

It *was* conceded that the plaintiff's team was being driven upon the right of the road going south, and that the defendant's team was running away upon the left going north. The complaint relates to the use of the words "was being driven," as applicable to the defendant's team. This complaint seems to be frivolous. The jury

could not have failed to understand what was meant. Indeed, the driver still held the reins, and, in a general sense, was driving — though not as well as he should have driven.

The defendant also urges that the learned judge should not have charged that the defendant's team was unlawfully and improperly on the left of the center of the road. But that was simply an abstract proposition emphasizing the general law of the road.

The concrete proposition, affecting the case under consideration, was put to the jury most favorably to the defendant when the learned judge subsequently, at his request, charged as follows: " That if these were runaway horses, and not under the control of the driver, and the driver used due diligence and the best of his ability as a skillful driver to control the horses, and could not control them, that then the law of the road as to which side the horses ran on after the fright, the law of the road does not apply."

So as to the charge with regard to the presumption of negligence attaching to a violation of the law of the road.

This was correct. (S. & R. Neg. §§ 13, 650, 651, 652.) But this was also an abstract proposition, as the case was put to the jury solely upon the negligence of the defendant's driver in not guiding his horses to the right, and thus avoiding a collision, as he might have done.

There are no other points with regard to the charge worthy of special consideration.

We find no error to the prejudice of the defendant; none which would justify a reversal.

The judgment and order denying the defendant's motion for a new trial should be affirmed, with costs.

VAN BRUNT, P. J., concurred.

PARKER, J. (dissenting):

I do not concur in the view that the evidence entitled the plaintiff to go to the jury.

Prior to the runaway, which resulted in serious injury to the plaintiff's horses and wagon, defendant's team had been much used, and had been proved to be gentle, free from fright, and without any kind of fault. Defendant's driver was a man of large experience in driving and handling horses, and his competency is not ques-

tioned. When defendant's family started out for one of their accustomed drives through Central Park on the occasion in question, the victoria was in the best of order ; the harness was in good condition; the horses were properly hitched, and the driver was properly mounted in his seat in the victoria, with the reins well in hand.

Up to this point, therefore, no basis can be found for charging the defendant with negligence.

But it is said the driver could have averted the collision by guiding his horses to the right, and that because of his failure to thus obey the law of the road the master is liable for the damages which resulted to plaintiff.

If it be the fact that the presence of the runaway horses on the wrong side of the road was due to the fault of the driver the proposition is sound, otherwise not.

As the driver was in great peril, and menaced with frightful possibilities of injury to the occupants of the carriage and himself, whether he was at fault in failing to guide the horses to the right cannot be determined by the test which applies where opportunity is afforded for calculation and the exercise of judgment unhampered by fear. But the distinction need not be insisted upon, for, as I view the evidence, if it should be assumed, as the prevailing opinion of the court necessarily does in effect, that defendant is liable if it was within the bounds of possibility for the driver to have guided the team to the right, the plaintiff should not have recovered, because the undisputed evidence was that the driver did his best to so guide them, and failed.

He said : " I was on the right-hand side of the drive at that time going north. The ladies were in the carriage. It was a victoria, and I was on the box. Before the fright I was doing and driving as usual. I had hold of the lines in the usual way. I was going down grade a little. That was about Eighty-sixth street, and there was a single horse, what I call a trotter, coming up. The trotter was coming south, coming, meeting me, and I don't know whether the gravel went from the wheels, or from the horse's foot, it went up on my nigh side horse's back, and he kicked up, and his leg went over the pole, and they ran away on me. They ran straight as far as the road was straight, and then when they came to the curve, they went to the gutter. I tried with all my might

to pull them out of the gutter and could not do it. * * * The trotter was coming down, was coming, meeting me. The trotter was coming to my left. The sand that was thrown up struck the near side horse, the one on the left. It was the horse on the west side that the gravel struck. * * * When the stone or sand struck the horse, I tried to steer them and stop them. I managed my lines with both hands. I kept them on my own side as far as the road went straight, but when they came to the curve, they went straight on for me, and I could not get them out; they went in the gutter, and I pulled them, on the off horse, with all my might, and I could not get them out of there. I pulled and was pulling and doing all that I possibly could all the time to stop them and steer them."

The witness was not a party to the action. He was in no respect discredited. His testimony was not disputed by any witness either directly or by stating circumstances permitting a contrary inference. But an attempt was made to create an issue of fact by the testimony of so-called experts. They were called upon to testify that runaway horses could be guided.

Before referring to their testimony it should be said that the fact was established beyond controversy that before commencing to run one of the horses got his leg over the pole, where it remained until after the collision. John B. Darr testified that runaway horses could be guided although it was impossible to stop them. When asked whether a horse would not try to pull his leg off the pole and thus draw it towards him he answered: "All the horses I ever had over the pole always tried to kick and get the leg back again." That defendant's horse did not try to do, and, therefore, this expert's experience did not include a similar case.

John S. Ferguson, the only other witness, who gave a similar opinion, said that his personal opinion was confined to four runaways and he admitted that he never had a horse get his leg over the pole.

Plaintiff's witness Dr. Cattnacht said: "And it is a fact that a horse, taking fright and getting his right hind leg — off hind leg — over a pole, and still laboring under the fright, will pull with an effort to get his leg from over the pole — will so pull in a direction opposite to the pole. Q. Is it not a fact that when a horse does

pull in a direction opposite to the pole, the bit in the mouth of the horse will have no control over him, his body will pull the team in a direction opposite to the pole? A. I never experienced the accident, but I would expect that that would be so. * * * I have seen the leg over the pole, yes, sir. A horse with the leg over the pole; the leg over the pole would goad the other horse to madness * * * and would frighten the other horse, you will observe, and that is the way I saw it when I have seen it. * * * I have seen such runaway that could be stopped by the driver, and I have seen where it could not be stopped. It depends on the spirit of the other horse. * * * If a horse has its leg over the pole, the other horse would carry him. * * * His leg which is over the pole would be stretched out towards the other horse to some extent and when he came in contact with the other horse's leg he would be apt to frighten the other horse. Then the other horse would run. I don't think that the force, which would take the horse with his leg over the pole along with the carriage off on the right side, would carry the carriage to the right. I don't think it would, because your dead weight is on the left. * * * I don't think you could turn him, sir. I don't think you could turn him to the right. * * * I have seen them run a quarter of a mile."

John Murphy, another witness called by the plaintiff, testified that he had been a park policeman since 1885, and had caught as many runaways as any man in the service. "It is my experience that when a frightened team is running away with one of the horses having his hind leg over the pole, it is impossible for the driver, no matter how skillful, to control or direct the team with the lines. It is impossible. It is impossible without some assistance, or unless the horse will bring his leg back from over the pole; I have had several cases of it."

Redirect examination by Mr. Dyett: "Q. Officer, do you mean that when a horse gets his leg over the pole, that you cannot guide him or that you cannot stop him? A. Yes, sir; I mean that the coachman has no power over him at all. Q. What? A. I mean that the driver has no power over him at all. Q. How do you mean? A. No power at all over him, for to pull them horses up. Q. To pull him up? A. No. Q. That is the horse will go where

you guide him until he gets his leg from —— A. Go? He will kick, he will do mischief, will tumble, everything, he is out of control. I have had so many, I venture to say, as twenty or thirty of them of that kind of runaways."

It seems to me absurd to say that the opinions of two alleged experts as to the possibility of guiding runaway horses, one of whom never had a case where one of the horses had his leg over the pole, and the horses of the other had always kicked to get off the pole, puts in issue the positive testimony of the driver that he tried with all his strength to guide the horses to the right.

If this position be right defendant's motion to dismiss the complaint should have been granted. But, assuming that the driver's testimony of what was done was put in issue by Barr and Ferguson's opinions as to what can generally be done, still a new trial should be granted because of the refusal of the court to grant a new trial on the ground that the verdict was against the weight of evidence.

Against Barr's and Ferguson's opinions were pitted not only the opinions of plaintiff's witnesses, Dr. Cattnacht and John Murphy, to which reference has already been made, but also the opinion of other witnesses of equal or greater experience. George B. Arnold, a foreman in a livery stable at 141 East Twenty-third street, and a practical coachman, etc., for twenty-two years, said it is impossible for any driver to stop or control a runaway, frightened team of good horses with one of them having a hind leg over the pole, and that he has had such causes himself.

Henry C. Overin, a livery stable man, now in business in Forty-second street and Seventh avenue, and also on Broadway, between Forty-fifth and Forty-sixth streets, a member of the firm of Overin & Markart, in the business and a practical driver himself for twenty-five years, and one who has had much experience with runaway horses himself, said: "Horses frightened and running away cannot be managed or controlled or stopped, especially if one of the team has its leg over the pole. You cannot guide a runaway horse, even if the leg is not over the pole."

Isaac Strauss testified that he was in the horse business; had driven horses all his life; considered himself a good horseman, and had horses run away with him. Whether horses running away could

be controlled, he said : " Well, I have never had the experience that I could control a horse when he is frightened, if he loses his head and cannot be controlled.  A horse is a good deal stronger than a man ; he is a good deal stronger than five men. · Q. When a horse is frightened and is running away, he don't obey the rein, does he ? A. His mouth becomes numb, and you cannot pull him anywhere ; it is impossible.  Q. Have you ever seen a case where a team has taken fright and one of the team gets his hind leg over the pole, and that team, in that condition frightened, one leg over the pole, running away ?  A. I have, sir."

Patrick Clark, a dealer in horses at 648 Broadway, American Horse Exchange, and a practical driver of coaches and private teams, had driven first class and valuable horses of all kinds, said : "A pair of runaway horses, able-bodied, good horses, running away from fright, cannot be controlled or stopped by a driver, a skillful, good, competent driver, not by one man.  They cannot.  I have experienced it."   He further said : "It is impossible for the defendant's driver, on the facts shown by the defendant in this case, to have stopped or controlled the direction or speed of the defendant's team."

Dr. James Haley, a veterinary surgeon, who has driven many and very good horses, and has given much 'attention, made many observations, and had much experience as to runaway horses, and gives instances, said : " From knowledge of horses that I have from my profession of veterinary surgeon, and from my prior and present dealing with horses, and from driving myself, and from observing the driving of both single and double, in my opinion it is not possible for even the most skillful and able driver to control, by way of stopping or directing the motion of a runaway team, which team can trot a mile in about three minutes, when the team is going at the rate of fourteen or fifteen miles an hour, and down a little descent, one of the horses with its leg over the pole, the hind leg over the pole, it is not possible, in my opinion."

If plaintiff's expert testimony tended to put in issue the testimony of defendant's witness describing what was actually done by him in his attempt to control the team, which I deny, still it was so fully met and overborne by other witnesses of equal experience, called by plaintiff and defendant, as to render a finding in hostility to the tes-

timony of Frazin, who was not discredited in any way, clearly against the weight of evidence.

That being the case, it is the duty of the court to reverse the judgment. And I so advise.

Judgment and order affirmed, with costs.